IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Shirley Mann, ) | |
| ) | Civil Action No. 8:05-0791-HMH-BHH |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Jo Anne B. Barnhart, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to widow's disability insurance benefits ("WDIB") and supplemental security income benefits ("SSI").

**ADMINISTRATIVE PROCEEDINGS**

On July 31, 2000, the plaintiff filed applications for disability insurance benefits and SSI. These claims were denied initially on December 12, 2000, and no further action was taken by the plaintiff.

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

On October 9, 2001, the plaintiff filed her current applications for WDIB and SSI alleging disability beginning April 15, 1998.[2] The applications were denied initially and on reconsideration. On October 24, 2002, the plaintiff requested a hearing, which was held on July 18, 2003. Following the hearing, at which the plaintiff and her attorney appeared, the administrative law judge considered the case *de novo*, and on February 24, 2004, determined that the plaintiff was not entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on January 12, 2005.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1)     The claimant met all of the nondisability requirements for Disabled Widow's Insurance Benefits set forth in Section 202(e) of the Social Security Act, and had a prescribed period that began September 1, 1994 and ended August 31, 2001.
>
> (2)     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)     The claimant has low back pain and residuals of a left wrist fracture, impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b) but not severe enough to "meet" or "equal" one of the listed impairments found in Appendix 1, Subpart P, Regulation No. 4.
>
> (4)     The claimant's allegations regarding her limitations are less than fully credible.
>
> (5)     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).
>
> (6)     The claimant has the residual functional capacity to perform work with restrictions that require no lifting or carrying over 25 pounds frequently, 50 pounds occasionally; limited stooping, crouching, and climbing of ladders or scaffolds; and

---

[2] Amended by the plaintiff at the hearing to April 1, 1998.

2

no constant gripping or grasping with the left (non-dominant) hand.

(8)   [sic] The claimant's past relevant work as hair stylist, as generally performed in the economy, did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

(9)   The claimant's medically determinable impairments do not prevent her from performing her past relevant work.

(10)  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(e) and 416.920(e)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which

prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

>evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### **EVIDENCE PRESENTED**

The plaintiff was 54 years old as of the alleged onset date of disability, September 1, 1997, and 61 years old as of the date of the ALJ's decision, February 24, 2004 (Tr. 72). She has a high school education plus training as a hair stylist (Tr. 92) and worked in the vocationally relevant past as a hair stylist and a care sitter (Tr. 87, 118).

On September 1, 1997, the plaintiff was injured at work when she slipped in a puddle of water and fell to the floor (Tr. 149 - 151). She fractured her left radius and strained her neck and thoracic spine (Tr. 153, 165).

On January 28, 1998, the plaintiff presented to Dr. Oregon Hunter for a rehabilitation medicine evaluation. She reported headaches and pain in her back, legs, and left arm, that worsened with standing. She reported that she could stand for 15 minutes and that she had decreased ability to sit. She said that a home exercise program and stretching helped her pain. On examination, the plaintiff did not exhibit pain behavior. Palpation revealed rigid paraspinous muscles and tenderness. She had mildly decreased range of motion in her neck and decreased range of motion in her lumbar spine Tinel's sign was negative for both wrists. The plaintiff's left wrist had mildly restricted range of motion.

5

She demonstrated good motor strength in the extremities, with no focal weakness and no atrophy. Deep tendon reflexes were normal and symmetrical. She had decreased sensation on her left side. The plaintiff's coordination, gait, heel/toe raising, and balance were all normal. Dr. Hunter assessed a left distal radial fracture with residual pain and crepitation in the left wrist and chronic pain in the spine, left arm, and both legs. He noted that she was expressing depression and anxiety symptoms. Dr. Hunter recommended further evaluation of the left wrist and adjusted her medications. In an accompanying "Activity Status Report" form, Dr. Hunter limited the plaintiff to no lifting over 10 pounds and no grasping, fine manipulation, pushing/pulling, or reaching with the left hand. He also opined that the plaintiff could never stoop or bend and that she needed to make position changes as needed (Tr. 164 - 168).

An MRI of the plaintiff's left wrist taken in February 1998 showed a small effusion, a possible ligament tear, and small degenerative erosions (Tr. 153; 169).

On April 1, 1998, Dr. Roger Powell wrote a letter to Dr. Hunter, in which he reported that the plaintiff experienced numbness and tingling in her left hand and could not pick up a glass of iced tea due to pain. Dr. Powell found the plaintiff had essentially normal range of motion bilaterally, with slightly limited finger range of motion and decreased flexion in her left wrist. She had decreased pinch and grip strength in her left hand compared with her right hand. Dr. Powell recommended an arthrogram to rule out a ligament tear (Tr. 153-54).

On July 23, 1999, the plaintiff presented to orthopedist Dr. John C. Baker for a consultative evaluation. She reported total spinal pain, but did not describe significant pain or numbness in her arms or legs. She described difficulty sitting and standing. The plaintiff said her left wrist was better but she reported constant aching in her left leg and arm. On examination, the plaintiff got up and down from a chair and on and off the examining table, without difficulty. Her shoulder station and gait were normal. Motor,

sensory, and reflex examinations of the extremities were normal. Range of motion in the shoulders, elbows, hips, and knees was normal. She had diminished range of motion in her neck and lumbar spine. Dr. Baker noted that x-rays showed multiple level disc disease, arthritis, and severe osteoporosis, and prescribed anti-inflammatory medication. Dr. Baker opined that the plaintiff "[met] the Social Security criteria for permanent total disability." He assessed a 15% permanent partial impairment. He indicated that her left wrist was improving and that it should resolve with medication (Tr. 149-52).

A series of x-rays taken on October 2, 2000, showed moderate L4-5 disc space narrowing and osteophyte formation; and mild degenerative changes in the left wrist (Tr. 173).

On October 25, 2000, the plaintiff presented to psychiatrist Dr. Auston Gray for a vocational rehabilitation evaluation. She said she was unable to work due to back problems. She also reported depressive symptoms, but indicated that antidepressant medication had been beneficial. Her past psychiatric history consisted of treatment after her husband's death, and two outpatient visits after her injury. A mental status examination was unremarkable other than her reports of depressive and anxiety symptoms. Dr. Gray assessed depressive and anxiety disorders, but indicated that her conditions appeared to be well-controlled with medication and "should not interfere with her ability to work." He indicated that she was "without severe symptoms" and should "continue to do well" (Tr. 174-76).

On November 13, 2000, state agency psychological consultant Kevin W. King reviewed the plaintiff's records and assessed her mental capacity. Mr. King found the plaintiff had a non-severe affective disorder that produced "mild" functional limitations (Tr. 255-65).

On November 17, 2000, the plaintiff presented to family practitioner Dr. William C. Aldrich with multiple complaints. A physical examination showed the plaintiff had

mild swelling, decreased flexion, and mild pain in her left wrist. She also had some swelling in the fingers of her left hand, more so than her right hand. Her right knee had some crepitus, but good range of motion. She had mild edema in her lower legs with mild pain. Dr. Aldrich assessed possible early arthritis, elevated blood pressure (150/98), and a fracture of the left wrist with deformity and "mild to moderate" functional deficit (Tr. 172).

On November 20, 2000, state agency physician Dr. Charles C. Jones reviewed the plaintiff's records and assessed her physical capacity. Dr. Jones found she could perform the exertional requirements of medium work with occasional climbing, stooping, and crawling. He further found that the plaintiff had limited ability to perform left upper extremity handling, specifically, that she could perform only "frequent" handling on that side (as opposed to constant handling) (Tr. 246-54).

On March 5, 2001, the plaintiff returned to Dr. Aldrich with complaints of dizziness, shortness of breath and high blood pressure. Dr. Aldrich noted that she had elevated cholesterol and triglycerides, and that she was at risk for coronary artery disease and diabetes. Because Dr. Aldrich's office was closed, the plaintiff was sent to the emergency room (Tr. 181).

Lumbar radiographs taken on August 13, 2001, revealed lumbar degenerative joint disease and right sacroiliac degenerative joint disease (Tr. 204). X-rays taken on December 5, 2001, showed small changes at the AC joint in the left shoulder with mild degeneration and no acute bony injuries. The x-rays also showed lumbar degeneration and possible gallstones (Tr. 205-06).

Also, on December 5, 2001, the plaintiff presented to Dr. Robert C. Franklin for a consultative evaluation in connection with her application for benefits. She reported severe headaches with nausea and chronic diffuse pain. She indicated that aspirin helped her symptoms. She also reported having fluid retention and daily dizziness. Dr. Franklin noted that the plaintiff was first diagnosed with hypertension in 1994, but that she was "okay

8

with her high blood pressure as long as she takes her medication." He noted her history of anxiety, insomnia, and intermittent depression. He also noted that she had a history of asthma. On examination, the plaintiff had tenderness in her back and left upper extremity. She also had swelling in her hands, more prominent in the left than right, and her left grip strength was less than her right grip strength. She had diminished range of motion in her left shoulder, back, and left knee. Dr. Franklin assessed spinal pain, considerable osteoarthritis in the back, fibromyalgia versus other etiologies for back pain, arthritis of the hands, "better controlled" hypertension, shoulder pain, history of anxiety, stable asthma, and history of osteoporosis (Tr. 208-10).

On February 7, 2002, state agency physician Dr. Robert D. Kukla reviewed the plaintiff's records and assessed her physical capacity. Dr. Kukla found the plaintiff could perform the exertional requirements of medium work with occasional climbing of ladders, ropes, and scaffolds (Tr. 237-45).

On July 3, 2002, the plaintiff returned to Dr. Gray for a consultative psychiatric evaluation in connection with her application for benefits. The plaintiff reported depressive symptoms and irritability. The mental status examination was unremarkable except for the plaintiff's complaints of depressive symptoms. Dr. Gray assessed a recurrent major depressive disorder without psychotic features. With regard to the plaintiff's level of functioning, Dr. Gray reported that she attended to her own activities of daily living, which included shopping, household chores, yard work, watching television, dining out occasionally, visiting with others, and driving. Dr. Gray noted that if the plaintiff would receive adequate medication management, her depressive symptoms would likely resolve (Tr. 213-16).

On July 15, 2002, state agency psychologist Hubert A. Eaker, Ph.D., reviewed the plaintiff's records and assessed her mental capacity. Dr. Eaker found the plaintiff had an affective disorder that produced only "mild" functional limitations (Tr. 233).

9

On August 20, 2002, the plaintiff presented to Dr. Raymond K. Allen for a consultative evaluation in connection with her application for benefits. She reported that she could not do anything for any length of time. She said anti-inflammatory medication helped her symptoms and that she was able to care for her personal needs. The plaintiff said that she could not do any significant amount of housework and that she had difficulty unscrewing jars, picking up objects from the floor, and holding objects in her hands. She complained of migraine headaches, which occurred twice weekly and which she treated with over-the-counter medication. She said she did not take medication or require emergency room treatment for her asthma, and she did not relate any specific complaints related to her hypertension and high cholesterol levels. On examination, the plaintiff's neck was supple and her spine did not show exhibit any tenderness or muscle spasm. She had good range of motion in her elbows, wrists, knees, and ankles, and had no signs of muscle atrophy. She was able to grasp and manipulate well with both hands, was ambulatory, and got on and off the examination table without assistance. Neurologically, there were no motor or sensory deficits. Dr. Allen assessed fibromyalgia, complaint of back pain, complaint of migraines, and complaint of asthma with a normal exam (Tr. 217-18). X-rays taken the same day showed advanced degenerative changes in the plaintiff's neck, and osteopenia and moderate degeneration in her left hand (Tr. 220).

At the administrative hearing on July 18, 2003, the plaintiff, through her attorney, amended her alleged onset date of disability to April 1, 1998 (Tr. 40). She testified that her right hand was worse than her left hand and that she could not grip anything (Tr. 42-43). She testified that she could lift a gallon of milk, but not a 20-pound bag of potatoes (Tr. 44). She said her back ached constantly and that her hips hurt when she stood or walked (Tr. 45). She testified that she could walk for 15 minutes at a time and sit for one hour at a time (Tr. 45 - 46). The plaintiff stated that her blood pressure, fluid retention, and anxiety were controlled with medication (Tr. 47). She said chiropractic care helped her

back, neck, hips, and headaches "a lot" (Tr. 48). She also said that anti-inflammatory medication helped relieve her arthritis pain (Tr. 49). She explained that she was "not into really taking medicine all that much." (Tr. 49). With regard to her daily activities, the plaintiff testified that she could care for her personal needs, fix simple meals, shop for groceries, and do occasional chores such as vacuuming, making the bed, washing clothes, dusting (Tr. 50).

In a "Report of Contact" form completed by an agency employee on September 13, 2000, it was reported that the plaintiff denied having any mood problems, but reported having weekly anxiety attacks that lasted most of the day. She stated that she had stopped seeing a psychiatrist in 1999 when she moved from Florida and that she received medication from her primary care physician, with no plans to see a psychiatrist. She also indicated that, other than sleep and anxiety problems, she felt mentally well and had no related restrictions in her daily living (Tr. 99).

In questionnaires submitted with her applications for benefits, the plaintiff reported that she cared for her personal needs, prepared meals slowly and with breaks, did housework on an infrequent basis, shopped for necessary items, attended church activities, visited with relatives, and drove a car, taking rest breaks every 50 miles (Tr. 126-29).

In a "Report of Contact" form completed by agency employee Betty Gum on June 4, 2002, Ms. Gum noted that the plaintiff took anti-anxiety medication and that she had a nervous breakdown at age 16. The plaintiff reported that she lived by herself, did housework and cooking in small increments, drove a car, shopped for groceries, completed puzzle books, watched television programs, and attended church. She said her right hand hurt worse than her left hand (Tr. 143).

## **DISCUSSION**

The plaintiff contends the ALJ erred in failing to find her disabled. Specifically, the plaintiff alleges that the ALJ erred in (1) failing to properly evaluate and give proper

weight to the opinions of her treating physicians; (2) failing to properly evaluate the plaintiff's residual functional capacity; and (3) failing to properly assess the plaintiff's credibility.

***Treating Physician Opinions***

The plaintiff argues that the ALJ erred in disregarding the opinions of three of her treating physicians. The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §416.927(d)(2)(2004); *Mastro v. Apfel*, 370 F.3d 171 (4th Cir. 2001). A "medical opinion" is a "judgment[] about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(20. However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *See Blalock*, 483 F.2d at 775.

The plaintiff first complains that the ALJ disregarded the opinion of Dr. Baker, who opined in July 1999 that the plaintiff "[met] the Social Security criteria for a permanent disability." From the record, it appears that Dr. Baker rendered this opinion after examining the plaintiff on only one occasion, in a consultative evaluation. He simply did not have the history with the plaintiff contemplated by the regulations allowing for controlling weight to be given to treating physicians' opinions. *See* 20 C.F.R. § 404.1527(d). In addition, as noted by the ALJ, Dr. Baker's opinion concerned the ultimate issue of disability, which is a legal determination reserved to the Commissioner and is not entitled to controlling weight.

With regard to the opinion of Dr. Franklin, the ALJ clearly considered Dr.

12

Franklin's 2001 evaluation. This evaluation, however, did not include any medical opinions with regard to functional limitations or capacity to perform work activity. Dr. Franklin merely assessed the plaintiff as having cervical, thoracic and lumbosacral pain with "considerable osteoarthritis." There were no opinions to be discounted or afforded controlling weight.

The ALJ also discounted the opinion of Dr. Hunter, the plaintiff's treating physician, who opined that the plaintiff could lift no more than 10 pounds and could perform no grasping, fine manipulation, pushing/pulling or reaching with her left hand. He also opined that the plaintiff could never stoop or kneel and that she needed to make position changes as needed. As noted by the ALJ, however, Dr. Hunter made this assessment only seven months after her accident and before she had reached maximum medical improvement. Moreover, while the ALJ clearly considered some limitations on the plaintiff's use of her left hand and some postural limitations, the record as a whole did not support the degree of limitations assessed by Dr. Hunter. As noted by the ALJ, Dr. Hunter's unsubstantiated limitations were inconsistent with other substantial evidence in the record. For instance, Dr. Hunter's own treatment notes indicated that the plaintiff did not exhibit any pain behavior and had only mild restrictions in her range of motion of her left wrist (Tr. 166). He also noted that she had good motor strength in all her extremities, with no muscle weakness or atrophy, and normal reflexes, coordination, gait, heel/toe raising ability and balance (Tr. 166).

Additionally, in April 1998, Dr. Powell found that the plaintiff had essentially normal range of motion in her wrists bilaterally, with only slightly limited range of motion in her fingers and slightly decreases flexion in her left wrist (Tr. 153-154). In November 2000, the plaintiff had only mild swelling and pain in her left wrist and some swelling in her left fingers; Dr. Aldrich noted that she had only "mild to moderate" functional deficits.

The findings of the state agency physician further support the ALJ's determination that the plaintiff could perform a limited range of medium work despite her

13

impairments. The state agency physician reviewed the plaintiff's medical records and determined that she retained the residual functional capacity to perform the minimal exertional requirements of medium work, with added restrictions, such as no climbing of ladders, ropes or scaffolds (Tr. 237 - 245). *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993) (ALJ may properly give significant weight to an assessment from a non-treating physician).

Based on the record as a whole, the court concludes that substantial evidence justifies the ALJ's decision to give the opinions of Drs. Baker, Franklin and Hunter concerning the plaintiff's functional limitations little weight.

***Residual Functional Capacity Assessment***

The ALJ found that the plaintiff had the residual functional capacity to perform a limited range of medium work activity, with restrictions on stooping, crouching and climbing and no constant gripping or grasping with the left hand. The plaintiff alleges that the ALJ failed to evaluate her residual functional capacity ("RFC") as required by Social Security Ruling 96-8p.

"Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, *1. SSR 96-8p provides in pertinent part:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id*. *7.

SSR 96-8p provides that the assessment of residual functional capacity must be based on all of the relevant evidence, including all allegations of physical and mental limitations or restrictions. When allegations of physical and mental limitations are made, the ALJ is to consider each function separately in making an assessment of residual functional capacity. However, the ALJ is obligated to consider only those limitations or restrictions which are alleged and/or based on relevant evidence.

The plaintiff contends that the ALJ erred in making his RFC determination for several reasons. First, the plaintiff alleges that the ALJ's analysis did not explain how he came up with the restrictions. The plaintiff also complains that the ALJ did not perform a function-by-function assessment as required by the regulations. The plaintiff also argues that the ALJ did not consider all of the plaintiff's impairments in making his RFC determination.

The RFC assessment here, while not overly specific, was clearly based on the ALJ's assessment of the medical and nonmedical evidence in the record. In the body of the decision, the ALJ thoroughly discusses all the evidence, including the plaintiff's testimony and the medical evidence. He also discusses the plaintiff's physical limitations and he clearly accepted some of these limitations by assessing her RFC at less than the full range of medium work, with clear physical restrictions supported by the evidence in the record. He was not required to consider impairments which were not supported in the record. Accordingly, the ALJ did not err in his RFC determination.

### *Plaintiff's Credibility*

Finally, the plaintiff argues that the ALJ erred in assessing her credibility as to her symptoms and condition.

A claimant's allegations of pain, disability, and limited function itself or its severity need not be accepted to the extent they are inconsistent with the available

evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers.  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is not necessary as long as the ALJ "sets forth the specific evidence he relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  The ALJ must make credibility determinations based upon all the evidence in the record, and properly supported credibility determinations will be upheld.  *See Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

In this case, while it is clear that the plaintiff experiences some pain, there is substantial evidence supporting the determination of the ALJ that this evidence was not entirely credible.  Although the plaintiff complained of disabling pain, there is evidence in the record that shows her pain, headaches and other impairments responded well to treatment.  As noted by the ALJ, the plaintiff never sought emergency treatment for her impairments, nor did she require hospitalization.  *See Hunter v. Sullivan*, 993 F.2d 31, 36 (4th Cir. 1993) (lack of hospitalization or emergency room treatment constitutes substantial evidence supporting credibility determination that pain is not disabling); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (an ALJ may consider the type of treatment a claimant receives in determining the extent of claimant's pain); *Shively v. Heckler*, 739 F.2d 989, 990 (4th Cir. 1984) (court noted minimal use of pain medication).  The ALJ also noted the evidence which showed that the plaintiff's daily activities, while limited, did include driving and occasional grocery shopping, working in her yard, preparing meals and visiting with friends and family.  *See Mickles*, 29 F.3d at 921

The ALJ in this case clearly considered the plaintiff's allegations of pain and he factored her limitations into his residual functional capacity assessment. The ALJ's decision to not fully credit the plaintiff's allegations of pain is supported by substantial evidence.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court concludes that the findings of the ALJ are supported by substantial evidence and recommends that the decision of the Commissioner be affirmed.

s/ Bruce H. Hendricks<br>
United States Magistrate Judge

June 20, 2006<br>
Greenville, South Carolina